Jocelyn DICKHOFF by her parents and
natural guardians Joseph DICKHOFF
and Kayla Dickhoff, Respondents,

v.

Rachel GREEN, M.D.,
et al., Appellants.

No. A11–0402.

Supreme Court of Minnesota.

May 31, 2013.

Rehearing Denied Sept. 9, 2013.

Kay Nord Hunt, Robert J. King, Stephen C. Rathke, Lommen, Abdo, Cole, King & Stageberg, P.A., Minneapolis, MN, for respondents.

William M. Hart, Damon L. Highly, Meagher & Geer, P.L.L.P., Minneapolis, MN; and Steven R. Schwegman, James S. McAlpine, Quinlivan & Hughes, P.A., St. Cloud, MN, for appellants.

Mark A. Hallberg, Marshall S. Lichty, Hallberg & McClain, P.A., Saint Paul, MN; and Lori L. Barton, Harper & Peterson, P.L.L.C., Woodbury, MN, for amicus curiae Minnesota Association for Justice.

Charles E. Lundberg, Mark R. Whitmore, Bassford Remele, P.A., Minneapolis, MN, for amici curiae Minnesota Hospital Association and Minnesota Medical Association.

## OPINION

ANDERSON, PAUL H., Justice.

Joseph and Kayla Dickhoff, on behalf of their six-year-old daughter, Jocelyn Dickhoff, allege that appellants Dr. Rachel Tollefsrud[1] and the Family Practice Medical Center of Willmar negligently failed to diagnose Jocelyn's cancer. The Dickhoffs claim that if Dr. Tollefsrud had timely diagnosed Jocelyn's cancer or referred Jocelyn to another physician for diagnosis and treatment, Jocelyn's cancer would have been curable. But, they assert, because of the delayed diagnosis, it is likely that Jocelyn's cancer will be fatal. The Kandiyohi County District Court granted summary judgment in favor of Dr. Tollefsrud and the Family Practice Medical Center, concluding that Minnesota law does not permit a patient to recover damages when a physician's negligence causes the patient to lose only a chance of recovery or survival. The court also concluded that the Dickhoffs' proof of causation failed as a matter of law and denied the Dickhoffs' claim for medical expenses arising from the recurrence of Jocelyn's cancer. The Minnesota Court of Appeals reversed, and Dr. Tollefsrud and Family Practice Medical Center then sought review by our court. Because we conclude that Minnesota law permits recovery for "loss of chance" in a medical malpractice action, we affirm.

Jocelyn Dickhoff was born in Willmar, Minnesota on June 12, 2006, to respondents Kayla and Joseph Dickhoff. Jocelyn was born approximately 5 weeks prematurely and spent the first 16 days of her life in the University of Minnesota Neonatal Intensive Care Unit for mild respiratory distress and pulmonary hypertension. When Kayla Dickhoff first took Jocelyn home from the hospital on June 28, 2006, she noticed a small lump on Jocelyn's left buttock.

The next day, Dr. Rachel Tollefsrud, a physician practicing with the Family Practice Medical Center of Willmar[2] (collec-

1. Dr. Rachel Green changed her surname to Tollefsrud while the action by the Dickhoffs was pending. We will refer to her as Dr. Tollefsrud in this opinion.

2. The Family Practice Medical Center is a

tively, "the appellants"), conducted Jocelyn's 2–week well-baby check. Kayla Dickhoff claims that she showed Dr. Tollefsrud the lump on Jocelyn's buttock at the first well-baby check and that Dr. Tollefsrud told her that the lump might be a cyst and that she would keep an eye on it. Kayla Dickhoff and Dr. Tollefsrud testified that the lump was pea-sized and moveable under the skin. However, Dr. Tollefsrud and the Dickhoffs dispute how often and to what extent they discussed the lump on Jocelyn's buttock. Dr. Tollefsrud contends that she only spoke with Kayla Dickhoff about the lump once before the 1–year well-baby check, and she does not recall the date of that conversation. Kayla Dickhoff asserts that she discussed the lump with Dr. Tollefsrud at Jocelyn's 2–, 4–, 6–, and 9–month well-baby checks. Kayla Dickhoff claims that by Jocelyn's 9–month well-baby check, the lump was three centimeters in diameter and was large enough to protrude from Jocelyn's buttock and push up against her soft tissue.

On June 14, 2007, at Jocelyn's regularly scheduled 1–year well-baby check, Dr. Tollefsrud first documented information about a "lump" on Jocelyn's medical chart. Dr. Tollefsrud testified that the "lump" she examined at the 1–year well-baby check presented in a different area of Jocelyn's buttock than the lump she had discussed with Kayla Dickhoff earlier. On Jocelyn's medical chart, Dr. Tollefsrud wrote: "[L]ump on buttock. [Jocelyn] [h]as had small lump on left buttock which had been unchanged, now has gotten larger. Also with redness in left perianal area. No diarrhea sometimes seems to be tender when wiping, other times doesn't bother her." Dr. Tollefsrud also included the following observations in Jocelyn's medical chart: "[L]eft perianal eythmea, mass palpitated, approximately 4 cm. diameter extending to buttock. Non-tender."

Following Jocelyn's 1–year well-baby check, Dr. Tollefsrud promptly scheduled an appointment for Jocelyn with Dr. Marie Schroeder, a pediatrician at the Affiliated Community Medical Center in Willmar. Dr. Schroeder examined Jocelyn and Jocelyn was subsequently referred to Dr. Robert Acton, a pediatric surgeon at the University of Minnesota Hospitals. Dr. Schroeder made this referral because she was concerned that the lump could be a malignant tumor. Dr. Brenda Weigel—a pediatric oncologist at the University of Minnesota—subsequently confirmed that the lump was cancerous.

Approximately 1 week later, Dr. Weigel diagnosed Jocelyn with alveolar rhabdomyosarcoma (ARS), a rare and aggressive childhood cancer.[3] Dr. Weigel concluded that Jocelyn's cancer was at stage IV and had metastasized. Following Dr. Weigel's diagnosis, Jocelyn began an intense regimen of chemotherapy, followed by surgery and radiation therapy. Physicians at the Memorial Sloan—Kettering Cancer Center in New York City—who performed the surgery removing Jocelyn's tumor—agreed that Jocelyn had ARS, but diagnosed the cancer at stage III.[4]

multi-physician clinic that provides a full range of medical services to patients in west-central Minnesota, including continuous inpatient and outpatient care. Each physician at the Family Practice Medical Center is a board-certified family practice specialist.

3. "ARS" is an aggressive type of rhabdomyosarcoma—a cancer of soft tissue (such as muscle)—that typically manifests "in the arms or legs, chest, abdomen, genital organs, or

anal area." *Childhood Rhabdomyosarcoma Treatment*, Nat'l Cancer Inst., http://www.cancer.gov/cancertopics/pdq/treatment/childrhabdomyosarcoma/Patient/page1 (last modified April 2, 2013).

4. At the time of the surgery, Jocelyn's treatment protocol called for a type of radiation therapy known as "brachytherapy," which involves the surgical insertion of rods that contain radioactive beads. The surgeon who

On April 6, 2009, Joseph and Kayla Dickhoff commenced this medical malpractice action against the appellants on Jocelyn's behalf. The Dickhoffs allege that the appellants negligently failed to timely diagnose Jocelyn's cancer or refer her to a specialist for diagnosis and treatment. They allege that Jocelyn's cancer was "curable" if timely diagnosed, but now Jocelyn's cancer most likely is fatal. The Dickhoffs claim that the appellants' negligence caused Jocelyn to suffer "injuries to her body which are permanent and/or fatal, and [Jocelyn] has incurred and will incur in the future, medical and other related expenses, pain, disability and disfigurement." The Dickhoffs also claim that the appellants' negligence caused Jocelyn to suffer loss of enjoyment of life and diminution of her earning capacity.

In support of their medical malpractice action, the Dickhoffs presented the expert opinions of Dr. James Gelbmann and Dr. Edwin Forman, pursuant to Minn.Stat. § 145.682 (2012).[5] The proffered testimony of Dr. Gelbmann, a family physician practicing at the Brainerd Medical Center, was that Dr. Tollefsrud deviated from the accepted standard of care for family practice physicians in Minnesota. The proffered testimony of Dr. Forman, a pediatric hematology and oncology physician, was on causation. In Dr. Forman's proffered testimony he stated his conclusion that Dr. Tollefsrud's failure to diagnose Jocelyn's cancer resulted in a delay in treatment that made it probable that Jocelyn will not survive her cancer. More specifically, Dr.

Forman, in his signed affidavits, indicated that he would testify as follows:

Based upon the changes which occurred prior to the correct diagnosis and the extent of metastasis, it is my opinion that the [ARS] was not metastatic when its symptom was first observed by Jocelyn's mother when Jocelyn was neonate. If this diagnosis had occurred at or shortly after the bump was noticed when Jocelyn was a neonate, more likely than not, Jocelyn's [ARS] would have been curable. Unfortunately, Jocelyn's disease is at Stage III/IV, and, more likely than not, she will not survive her disease.

Dr. Forman also indicated in his affidavits that he would further testify that, based on the progression of the cancer prior to the correct diagnosis and the extent of metastasis, Jocelyn's chance of survival was only 40 percent. Dr. Forman asserts that even though the overall survival rate for ARS is 60 percent, Jocelyn's chances of survival if the cancer had been timely diagnosed and treated "would have been much higher than 60 percent" because the capacity to develop distant metastases—the hallmark of stage IV ARS— "probably is not in the biology of her particular cancer."

The appellants' response to the proffered expert testimony was a complete denial that they were negligent, that they deviated from any accepted standard of medical practice, or that "any act or omission on their part caused or contributed to cause damage" to Jocelyn or the Dickhoffs. A jury trial was scheduled for May

---

places the rods is also the surgeon who needs to prepare the area where those rods will be placed. Memorial Sloan–Kettering was the only hospital in the United States that could insert the rods in a child under 2 years of age at the time of Jocelyn's diagnosis. As a result, the surgery removing Jocelyn's tumor was performed at Memorial Sloan–Kettering.

5. Minnesota Statutes § 145.682 provides that a plaintiff in a medical malpractice action must produce an expert affidavit that expresses opinions that establish that the defendant deviated from the standard of care and caused injury to the plaintiff. *Id.,* subd. 3.

10, 2010. On April 15, 2010, the district court ruled that the Dickhoffs could not recover any general or special damages for Jocelyn's past medical expenses. The Dickhoffs conceded that Jocelyn would have received essentially the same treatments—chemotherapy, surgery, and radiation—even in the absence of the appellants' negligence. Following the ruling, the Dickhoffs continued to seek damages for Jocelyn's future medical expenses and the additional pain and suffering that Jocelyn will experience because of those future treatments. As trial approached, the Dickhoffs requested that the court modify Minnesota's pattern jury instruction for future damages for bodily and mental harm by deleting the word "embarrassment" and inserting the phrase "deprivation of normal life expectancy" so Jocelyn could recover damages for the shortening of her life. *See* 4A Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Civil,* CIVJIG 91.25 (5th ed.2006).

The appellants filed several motions in limine, including a motion that sought to preclude the Dickhoffs' claim of damages for the deprivation of Jocelyn's normal life expectancy as an impermissible "loss of chance" claim. Shortly thereafter, Jocelyn's cancer recurred. On May 7, 2010, the district court continued the trial, in part because "the medical condition of the child [Jocelyn] is evolving and recently her condition has deteriorated significantly." The court subsequently rescheduled the trial.

Before the rescheduled trial date, the appellants filed a motion to dismiss the Dickhoffs' medical malpractice action. In that motion, the appellants asserted that the Dickhoffs' claim of damages for the shortening of Jocelyn's life expectancy was a prohibited "loss of chance" claim. The appellants also asserted that the Dickhoffs'

claim of damages for future medical expenses based on the recurrence of Jocelyn's cancer should be dismissed because the Dickhoffs' proof of causation failed as a matter of law.

The Dickhoffs treated the appellants' "motion to dismiss" as a motion for summary judgment and submitted a supplemental affidavit on causation from Dr. Forman. In that supplemental affidavit, Dr. Forman explained that he had reviewed the medical records regarding the recurrence of Jocelyn's cancer. Based on this review of Jocelyn's medical records, Dr. Forman concluded:

If Jocelyn Dickhoff's rhabdomyosarcoma had been timely diagnosed and treated, it is unlikely that she would have suffered the 2010 recurrence, required the subsequent medical care and potential additional care in the future. In other words, it is [the appellants'] failure to timely diagnose and treat Jocelyn Dickhoff's rhabdomyosarcoma that changed the likelihood of recurrence and need for additional care from unlikely to probable. It is impossible to put precise statistics on the circumstances with or without timely care. It is without question, however, based on my expertise, that it was the failure to provide timely care and treatment in this case that is to blame for the recurrence and recent need for medical care.

The district court granted the appellants' motion. The court concluded that the Dickhoffs' claim for Jocelyn's "reduced life expectancy and increased risk of recurrence" was essentially "a claim for loss of chance of life" that was foreclosed by our court's prior case law. The district court also dismissed the Dickhoffs' claim for medical expenses based on the cancer's recurrence, concluding that the Dickhoffs failed to present sufficient expert testimony showing that "it is more proba-

ble than not that the [appellants'] alleged negligence is the cause of [the Dickhoffs'] damages, as opposed to the chance of recurrence already present absent the [appellants'] alleged negligence."

The Dickhoffs appealed, and the court of appeals reversed. The court of appeals held that our decision in *Fabio v. Bellomo*, 504 N.W.2d 758 (Minn.1993), rejected only "reduced chance"—defined as a "mere reduction in chance of survival"—as a theory of recovery. *Dickhoff v. Green*, 811 N.W.2d 109, 113–14 (Minn.App.2012). The court of appeals concluded that a "patient states a malpractice claim based on a failure to diagnose if the misdiagnosis makes it more probable than not that [the patient] will not survive her cancer," even if "a physician's contribution to an already bleak prognosis is not large but just enough to make death most likely." *Id.* at 114. The court of appeals held that the district court erred by granting summary judgment to the appellants because the Dickhoffs' claim was not foreclosed under Minnesota law. *Id.* at 115.

The court of appeals also held that the district court erred when it dismissed the Dickhoffs' claim for Jocelyn's recurrence-related medical expenses. *Id.* In reaching that holding, the court of appeals concluded that Dr. Forman's affidavits supported the Dickhoffs' claim that the appellants' negligence "raised the likelihood of [Jocelyn's] cancer's recurrence and her need for additional care from unlikely to probable," and therefore "a jury could also find that it is more probable than not that the recurrence was caused by Dr. Tollefsrud's negligence." *Id.* We granted the appellants' petition for further review.

## I.

As a preliminary matter, we must determine the appropriate standard of review. To do so, we need to ascertain the precise nature of the district court's order. The motion submitted by the appellants, while labeled a "motion to dismiss," cited no Minnesota Rule of Civil Procedure. The Dickhoffs responded to the motion as if it were one for summary judgment. In ruling on the appellants' "motion to dismiss," the district court relied on information outside the pleadings—specifically, Dr. Forman's affidavits. When the parties present matters outside the pleadings and those matters are not excluded by the district court, we treat the court's order as one for summary judgment. *See* Minn. R. Civ. P. 12.02 ("If, on a motion asserting the defense that the pleading fails to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment. . . ."); *Antone v. Mirviss*, 720 N.W.2d 331, 334 n. 4 (Minn.2006) (reviewing a district court's decision to grant the defendant's motion to dismiss under a summary judgment standard of review because the parties presented, and the court did not exclude, affidavits in support of their positions). Based on our case law and the record in this case, we conclude that the summary judgment standard of review is the appropriate standard to apply.

Our rules of civil procedure provide that summary judgment shall be granted only when the evidence "show[s] that there is no genuine issue as to any material fact and that either party is entitled to a judgment as a matter of law." Minn. R. Civ. P. 56.03. On appeal from summary judgment, we review de novo "(1) whether there are any genuine issues of material fact; and (2) whether the lower courts erred in their application of the law." *Schafer v. JLC Food Sys., Inc.*, 695 N.W.2d 570, 573 (Minn.2005). We examine the evidence in the light most favorable

to the party against whom summary judgment was granted. *STAR Ctrs., Inc. v. Faegre & Benson, L.L.P.*, 644 N.W.2d 72, 76–77 (Minn.2002).

## II.

◾ The next question presented by this case is whether the district court erred by ruling that the Dickhoffs' claim of damages for Jocelyn's reduced life expectancy is a claim for "loss of chance" that is prohibited under Minnesota law. To establish a prima facie case of medical malpractice, a plaintiff must prove, on the basis of expert medical testimony, "(1) the standard of care recognized by the medical community as applicable to the particular defendant's conduct, (2) that the defendant in fact departed from that standard, and (3) that the defendant's departure from the standard was a direct cause of [the patient's] injuries." *Plutshack v. Univ. of Minn. Hosps.*, 316 N.W.2d 1, 5 (Minn. 1982). In this case, causation and damages—essential elements of every medical malpractice action—are both contested on appeal.

Here, the Dickhoffs seek two forms of damages. First, the Dickhoffs seek damages for the additional medical expenses that they incurred based on the recurrence of Jocelyn's cancer, as well as damages for pain and suffering that Jocelyn experienced because of treatments she received for the recurrence of her cancer. The appellants concede that, if the Dickhoffs have satisfied their burden to establish a prima facie case of causation, then damages for Jocelyn's recurrence-related medical expenses are potentially recoverable.[6]

Second, the Dickhoffs contend—based on expert medical testimony—that Jocelyn had at least a 60 percent chance of recovery or survival if the cancer had been diagnosed at or soon after Jocelyn's first well-baby check. They further contend that Dr. Tollefsrud negligently failed to render a diagnosis and that her failure to do so reduced Jocelyn's chance of recovery or survival to no better than 40 percent. In other words, the Dickhoffs' claim that Dr. Tollefsrud's negligence caused an increased risk that Jocelyn's cancer would recur and decreased the probability of her long-term survival. However, the appellants contend that an increased risk of recurrence of cancer and a corresponding reduction in the probability of a patient's chances of survival are not compensable injuries under Minnesota law. The appellants argue that when a particular type of injury is not compensable as a matter of law, the evidence supporting that type of injury is not material. In the appellants' view, the district court correctly ruled that the Dickhoffs are seeking to recover damages for loss of chance and that "a claim for loss of chance of life is prohibited as a matter of law in Minnesota."

◾ Under the loss of chance doctrine, a patient may recover damages when a physician's negligence causes the patient to lose a chance of recovery or survival. *See Matsuyama v. Birnbaum*, 452 Mass. 1, 890 N.E.2d 819, 823 (2008); Dan B. Dobbs et al., *The Law of Torts* § 196, at 661–62 (2d ed.2011). The fundamental principle underlying the loss of chance doctrine is that "the plaintiff's chance of survival itself has value." Dobbs et al., *supra*, § 196, at 664. In a loss of chance case, the plaintiff must sustain the burden of proving that "the defendant negligently deprived her of a chance of a better outcome." *Id.* at 664 (footnote

---

6. We address this damages issue—whether the district court erred by dismissing the Dickhoffs' claim for damages arising from the recurrence of Jocelyn's cancer—in Part III, below.

omitted). Assuming that the plaintiff satisfies that burden, then "the defendant should be liable for the value of the chance he has negligently destroyed." *Id.*

The Dickhoffs resist the notion that their medical malpractice claim is premised on the "loss of chance" doctrine by framing the injury allegedly caused by Dr. Tollefsrud's negligence in terms of a "cure." In their principal brief, they repeatedly assert that Dr. Tollefsrud's negligent failure to diagnose Jocelyn's cancer "deprived" Jocelyn of a cure by "allow[ing] the cancer to grow to an advanced stage [such] that it is no longer curable." However, we conclude that the Dickhoffs' claim that Dr. Tollefsrud's negligence "deprived" Jocelyn of a "cure" appears simply to be a way of alleging "loss of chance" without using those particular words. Otherwise, it is difficult to ascertain the nature of the injury that the Dickhoffs attribute to Dr. Tollefsrud's negligence.[7] Indeed, the Dickhoffs have conceded that their proof of causation failed with respect to Jocelyn's past medical expenses—that is, expenses Jocelyn incurred during her initial treatment for cancer and any pain and suffering associated with that course of treatment. In essence, the Dickhoffs acknowledge that Jocelyn would have received essentially the same treatment protocol of chemotherapy, surgery, and radiation in the absence of the appellants' alleged negligence. Accordingly, the injury that lies at the heart of the Dickhoffs' medical malpractice action is a claim that Dr. Tollefsrud's alleged negligence increased the risk that Jocelyn's cancer would recur and decreased her chances of survival—an archetypal loss of chance claim in a failure-to-diagnose cancer case.[8] *See Herskovits v. Grp. Health Coop. of Puget Sound,* 99 Wash.2d 609, 664 P.2d 474, 481 (1983) (Pearson, J., concurring).

### A.

Given the foregoing analysis, it becomes evident that we must next determine whether a medical malpractice claim alleging loss of chance is cognizable in Minnesota. The appellants assert that in *Fabio* we

---

**7.** The Dickhoffs also assert that their claim is not premised on the "loss of chance" doctrine because the probability that Jocelyn would survive in the absence of Dr. Tollefsrud's negligence was greater than 50 percent. That assertion has some persuasive value given that the loss of chance doctrine generally arises in cases in which the plaintiff's pre-negligence odds of survival are less than 50 percent. Nevertheless, the mere fact that Jocelyn had a better-than-even chance of surviving her cancer does not take her case outside the purview of the "loss of chance" doctrine. *See Renzi v. Paredes,* 452 Mass. 38, 890 N.E.2d 806, 809 (2008) (holding that recovery for loss of chance of survival is appropriate when the physician's breach of duty destroyed or diminished the patient's pre-negligence chance of survival to less than even, regardless of whether that pre-negligence chance was better than even or less than even).

**8.** The dissent contends that our decision is unwarranted because the Dickhoffs "explicitly disavow a loss of chance theory." Yet the court *unanimously* agrees that the Dickhoffs have presented a "quintessential 'loss of chance' claim." Indeed, the appellants have argued before the district court, the court of appeals, and our court that the Dickhoffs cannot recover damages for loss of chance. Simply because the Dickhoffs have continually labeled their claim a "traditional tort negligence claim" does not mean that our court is bound to accept that mischaracterization. And while the Dickhoffs have argued that their claim is not premised on the loss of chance doctrine, the Dickhoffs have *always* maintained that Minnesota law supports their claim for damages. Thus, the issue is squarely presented for our consideration. *See Rickert v. State,* 795 N.W.2d 236, 240–41 n. 2 (Minn.2011) (stating that "[b]ecause the ... issue is squarely presented by one party, and not conceded by the other party, our consideration of the issue is not improper").

conclusively rejected the "loss of chance" doctrine as a theory of tort recovery. *See Fabio v. Bellomo*, 504 N.W.2d 758, 762–63 (Minn.1993).[9] Both the district court and the court of appeals agreed with the appellants' assertion. Therefore, we need to examine *Fabio* in some detail to determine whether we have previously held, as a matter of law, that a claim for "loss of chance" is prohibited in Minnesota.

In *Fabio*, the plaintiff, Delores Fabio, alleged that her primary care physician negligently failed to diagnose her breast cancer. 504 N.W.2d at 760–61. Fabio claimed that on at least two occasions her primary care physician "noticed a lump in her left breast, but told her not to worry about it because it was a 'fibrous mass.'" *Id.* at 760. After her physician retired from the practice of medicine, Fabio discovered that the lump in her breast was cancerous and had metastasized. *Id.* Fabio sued the physician for medical malpractice, claiming that he was negligent for failing "to palpate the lump or order a mammogram when he noticed [the lump]." *Id.* Fabio argued, among other things, that she suffered a compensable legal injury because her physician's failure to timely diagnose her breast cancer "resulted in a 'loss of chance' of life expectancy and a greater risk of recurrence of cancer." *Id.* at 761. The district court granted summary judgment in favor of the physician. *Id.*

On appeal, we considered "whether Fabio [had] put forth sufficient evidence of causation and damages against [her physician] for his alleged malpractice." *Id.* We concluded that Fabio had failed to establish that it was "more probable than not" that her physician's negligence caused her to suffer any injury, and therefore we affirmed the district court's decision to grant summary judgment to the physician. *Id.* at 762–63. In doing so, we also declined to allow Fabio's loss of chance claim to proceed, stating:

> Fabio's second theory of recovery is for "loss of chance." She argues that her increased chance of recurrence of cancer and her decreased chance of living another 20 years are compensable injuries. We have never recognized loss of chance in the context of a medical malpractice action, and we decline to recognize it *in this case*.

*Id.* at 762 (emphasis added).

We acknowledge that our discussion of the "loss of chance" doctrine in *Fabio* intimated that we were rejecting "loss of chance" as a theory of tort recovery. Nevertheless, the appellants and the district court read our decision in *Fabio* too broadly. At best, we offered two alternative justifications for the holding in *Fabio*: (1) we declined to recognize loss of chance "*in this case*" and (2) we concluded that Fabio had not presented sufficient evidence of causation to make out a loss of chance claim. Neither justification was necessary to our decision in *Fabio*, which renders our discussion on whether a loss of chance claim is *ever* cognizable in Minnesota—to the extent *Fabio* even discussed loss of chance outside of the facts of that case—

---

9. The court of appeals held that our decision in *Fabio* rejected the "loss of chance" doctrine, but relied on our decision in *MacRae v. Group Health Plan, Inc.*, 753 N.W.2d 711 (Minn.2008), to conclude that a "reduction in chance that drops the prognosis of [the patient's probability of survival] below 50 percent"—termed an "*improbable-survival claim*"—was permitted. *Dickhoff*, 811 N.W.2d at 113–14. The court of appeals distinguished between "*reduced-chance*" claims and "improbable survival" claims to "avoid confusion." *Id.* at 113. We do not find the court of appeals' terminology useful and will refer to the Dickhoffs' claim as one for "loss of chance."

mere dictum.[10]  *See Curtis v. Altria Grp., Inc.,* 813 N.W.2d 891, 901 n. 6 (Minn.2012) ("[A] decision by the court ... on one argument renders a decision on the other argument dictum."); *see also MacRae v. Grp. Health Plan, Inc.,* 753 N.W.2d 711, 719 (Minn.2008) (noting that a statement that is not necessary to the holding in a case is not binding precedent).  Moreover, while we declined to recognize the loss of chance doctrine based on the facts of *Fabio,* we did not foreclose the possibility that we would revisit that question in an appropriate case.  *Cf. Smith v. Brutger Cos.,* 569 N.W.2d 408, 414 (Minn.1997) (declining to recognize the tort of negligent misrepresentation involving the risk of physical harm based on the facts of the case, but without foreclosing the future possibility of recognizing that tort).  Accordingly, we conclude that our perfunctory treatment of the loss of chance doctrine in *Fabio* is not controlling, and whether we should recognize the loss of chance claim at issue in *this* case is an unresolved question of law that we must now address.[11]

**10.** The dissent disagrees with our characterization of the discussion of loss of chance in *Fabio* as dicta, claiming that we conclusively resolved the question of whether loss of chance is cognizable in Minnesota in that case.  We disagree.  Our cursory and uncritical discussion of loss of chance in *Fabio* is dicta at best and is akin to the history of our treatment of the tort of invasion of privacy.  More specifically, in *Hendry v. Conner,* we acknowledged that Minnesota had never recognized the tort of invasion of privacy, but noted that even if the court were to do so, the defendant's conduct did not constitute a violation of the plaintiff's privacy.  303 Minn. 317, 319, 226 N.W.2d 921, 923 (1975).  Nearly 25 years later, in *Lake v. Wal–Mart Stores, Inc.,* we concluded that whether to recognize the tort of invasion of privacy was a "question of first impression," stating that "[p]revious cases have addressed the right to privacy torts only tangentially, in dicta."  582 N.W.2d 231, 233 & n. 1 (Minn.1998) (citing *Hendry,* 303 Minn. at 319, 226 N.W.2d at 923).  Today, no one can credibly assert that our discussion of the tort of invasion of privacy in *Hendry* was anything other than dicta and the same is true of any discussion of loss of chance in *Fabio.*

**11.** The dissent also asserts, no fewer than nine times, that we "rejected" the loss of chance doctrine in *Leubner v. Sterner.*  The dissent's assertion lacks merit when first made and repetition does nothing to render that assertion more persuasive or meritorious.  First, the dissent selectively quotes from *Leubner.*  The dissent quotes the following, for instance, as support for our purported rejection of loss of chance:

> Arguably, the injury claimed to be caused is a decreased percentage chance of surviving, whether or not the patient, in fact, has survived.  Here the difficulty is perhaps not so much in proving causation as "more probable than not," but in what appears to be the amorphous and speculative nature of the asserted "injury," especially as it applies to a particular patient.

*Leubner v. Sterner,* 493 N.W.2d 119, 121 (Minn.1992).  The dissent conveniently omits the next sentence: *"In any event, plaintiffs have not asserted such a claim." Id.* (emphasis added).  The statement relied on by the dissent is therefore, at best, pure dictum—even under the dissent's definition of that term—because it went beyond the facts before our court and merely constitutes an expression of the author's opinion.  *See State ex rel. Foster v. Naftalin,* 246 Minn. 181, 208, 74 N.W.2d 249, 266 (1956).

The dissent's persistent assertion that we rejected the loss of chance doctrine in *Leubner* is flawed for a second reason.  In *Leubner,* we explicitly granted the defendants' petition for further review on the sole issue of whether Minnesota recognized a cause of action for negligent aggravation of a pre-existing disease.  493 N.W.2d at 120–21.  In so doing, we expressly noted that "[p]laintiffs did not file a notice of review to preserve their 'lost chance of survival claim.' " *Id.* Accordingly, in *Leubner* we did not even address—much less reject—loss of chance because, to the extent the issue of loss of chance had been raised below, the plaintiffs waived it on appeal.  *See State v. Koppi,* 798 N.W.2d 358, 366 (Minn.2011) (explaining that failure to preserve an issue on appeal results in waiver).

In short, the dissent's attempt to use *Leubner* for the proposition that we rejected the loss of chance doctrine is groundless.

## B.

We now consider whether Minnesota law allows a patient to recover damages when a physician's negligence causes the patient to lose a chance of recovery or survival. We conclude that it does.

The loss of chance doctrine developed in response to a problem that is particularly acute in the medical malpractice context, especially in the case of a physician who fails to provide a timely diagnosis or treatment of a disease. *See Matsuyama,* 890 N.E.2d at 834–35 (citing Restatement (Third) of Torts: Liability for Physical Harm § 26 cmt. n (Proposed Final Draft No. 1, 2005) (Draft Restatement)); Dobbs et al., *supra,* § 196, at 661–62. We have recognized that in such a situation, the plaintiff does not claim that "the disease itself ... was caused by the physician," but that the "physician's delay resulted in harm that could have been prevented." *Leubner v. Sterner,* 493 N.W.2d 119, 122 (Minn.1992). It is that harm to the chance of survival that a plaintiff seeks to recover in a loss of chance case.

█ Under traditional principles of tort causation, a plaintiff is required to prove that it is "more probable than not" that the harm resulted from the physician's negligence as opposed to the preexisting condition. *Id.* at 121. If a plaintiff meets that burden of proof, she recovers 100 percent of her damages. *See Tarnowski v. Resop,* 236 Minn. 33, 38–39, 51 N.W.2d 801, 804 (1952) (explaining that "[t]he general rule with respect to damages for a tortious act is that the wrongdoer is answerable for all the injurious consequences of his tortious act" (citation omitted) (internal quotation marks omitted)). Conversely, a plaintiff recovers nothing if she is unable to establish that the physician's negligence "more probabl[y] than not" caused the harm. *See Leubner,* 493 N.W.2d at 121. Under that

"all or nothing" rule, a patient whose pre-negligence odds of survival were 50 percent or lower can *never* establish, as a matter of law, that an alleged faulty diagnosis "more likely than not" was the cause of the patient's injury. *See generally* Joseph H. King, Jr., *Causation, Valuation, and Chance in Personal Injury Torts Involving Preexisting Conditions and Future Consequences,* 90 Yale L.J. 1353, 1363–70 (1981) (criticizing the arbitrariness of the traditional all or nothing approach to tort causation).

The "all or nothing" approach to causation has been questioned on the grounds that it undermines the fundamental aims of tort law, including compensation for victims of medical negligence and the deterrence of unsafe conduct by health care providers. *See Herskovits,* 664 P.2d at 486–87 (Pearson, J., concurring). The "all or nothing" approach also fails to recognize the common sense proposition that a loss of chance of survival or recovery *does* injure a person. Indeed, the all or nothing rule " 'fails to deter' medical negligence because it immunizes 'whole areas of medical practice from liability.' " *See, e.g., Matsuyama,* 890 N.E.2d at 830 (quoting *McMackin v. Johnson Cnty. Healthcare Ctr.,* 73 P.3d 1094, 1099 (Wyo.2003)); *see also* King, *supra,* at 1377–78 (describing how the all or nothing approach to causation subverts the compensatory, risk spreading, and deterrence objectives of tort law); *cf.* Restatement (Second) of Torts § 901 (1979) (listing the purposes for awarding tort damages, including deterrence).

█ By contrast, the "loss of chance" doctrine recognizes that a patient values her chances of recovery or survival and she suffers a real injury when a physician's negligence reduces that chance, regardless of whether the patient's chance of survival was above or below 50 percent at the time

of the physician's negligence. *See Matsuyama*, 890 N.E.2d at 823; *see also Murrey v. United States*, 73 F.3d 1448, 1453–54 (7th Cir.1996) (Posner, C.J.) ("A loss is a loss even if it is only probable, as are most things in life."). As one distinguished torts scholar has observed, when a physician negligently misses a diagnosis of a patient's cancer, it is clear that, "ex ante, no patient would be indifferent to that loss of opportunity, which is why good physicians command high fees for good diagnosis." Richard A. Epstein, *Torts* 252 (1999).

Because the doctrinal underpinnings of the loss of chance doctrine have proved to be fundamentally sound, a growing number of jurisdictions have adopted some form of the doctrine, albeit with divergent rationales.[12] Some jurisdictions that have endorsed the loss of chance doctrine have done so by relaxing the plaintiff's burden on causation. *See Delaney v. Cade*, 255 Kan. 199, 873 P.2d 175, 185–86 (1994) (adopting a "relaxed" causation approach to loss of chance claims); *McKellips v. Saint Francis Hosp., Inc.*, 741 P.2d 467, 475 (Okla.1987); *Hamil v. Bashline*, 481 Pa. 256, 392 A.2d 1280, 1284–85 (1978). Other jurisdictions view the reduction in the likelihood of a better outcome—i.e., the "lost chance"—as a compensable injury in and of itself. *See, e.g., Alexander v. Scheid*, 726 N.E.2d 272, 279 (Ind.2000); *Matsuyama*, 890 N.E.2d at 832; *Lord v. Lovett*, 146 N.H. 232, 770 A.2d 1103, 1105–06 (2001); *Alberts v. Schultz*, 126 N.M. 807, 975 P.2d 1279, 1284–85 (1999).

We reject the causation rationale, but we agree with those courts that treat the reduction of a patient's chance of recovery or survival as a distinct injury. It should be beyond dispute that a patient regards a chance to survive or achieve a more favorable medical outcome as something of value. *See Murrey*, 73 F.3d at 1454; Dobbs et al., *supra*, § 196, at 664. We agree with the Supreme Judicial Court of Massachusetts: "When a physician's negligence diminishes or destroys a patient's chance of survival, the patient has suffered real injury. The patient has lost something of great value: a chance to survive, to be cured, or otherwise to achieve a more favorable medical outcome." *Matsuyama*, 890 N.E.2d at 832; *see also Lord*, 770 A.2d at 1105–06; Epstein, *supra*, at 253. Accordingly, we conclude that a physician harms a patient by negligently depriving her of a chance of recovery or survival and should be liable for the value of that lost chance.[13]

The longstanding proof problem associated with loss of chance claims was that it was difficult, if not impossible, to prove causation for a loss of chance injury. In that sense, we are not recognizing a

---

**12.** The highest courts of Arizona, the District of Columbia, Illinois, Indiana, Iowa, Kansas, Louisiana, Massachusetts, Missouri, Montana, Nevada, New Jersey, New Mexico, Ohio, Oklahoma, Pennsylvania, South Dakota, Virginia, Washington, West Virginia, Wisconsin, and Wyoming have endorsed some form of the loss of chance doctrine over the past three decades. *See Matsuyama*, 890 N.E.2d at 828 n. 23 (collecting cases). By contrast, the highest courts of Florida, Idaho, Maryland, Mississippi, New Hampshire, Tennessee, Texas, South Carolina, and Vermont have rejected the loss of chance doctrine. *Id.* at 828–29 n. 23.

**13.** We agree with those courts that require "the lessened degree of recovery resulting from the medical malpractice [to] be more than a token or de minimis amount." *Delaney*, 873 P.2d at 186–87. However, we need not, and do not, quantify the outer boundaries of the loss of chance doctrine in this case because, as we discuss more fully below, the Dickhoffs have presented evidence that Dr. Tollefsrud's negligence reduced Jocelyn's chances of survival from at least 60 percent to 40 percent. Such a reduction, as a matter of law, is neither token nor de minimis.

new injury as such. Rather, we are recognizing that an injury that has always existed is now capable of being proven to a reasonable degree of certainty. *See Matsuyama*, 890 N.E.2d at 834 (explaining that "medical science has progressed to the point that physicians can gauge a patient's chances of survival to a reasonable degree of medical certainty, and indeed routinely use such statistics as a tool of medicine"). As a result, the reliability of the evidence that victims of medical malpractice are able to marshal when a physician's negligence reduces a patient's chance of recovery or survival has dramatically improved in recent years—now making it possible to prove causation in a loss of chance case. *Id.* at 834–35. Indeed, in light of modern medical science, allowing a patient to recover damages for a lost chance of recovery or survival is no more abstract, speculative, or hypothetical than allowing the jury to determine damages for the loss of a victim's earning capacity throughout his or her lifetime—an inquiry that courts and juries routinely undertake, and that our court has long endorsed.[14] *See, e.g., Berg v. Gunderson*, 275 Minn. 420, 428–29, 147 N.W.2d 695, 701 (1966) (permitting recovery of damages for permanent impairment or loss of earning capacity); *see also DePass v. United States*, 721 F.2d 203, 207 (7th Cir.1983) (Posner, J., dissenting) (explaining that probabilities that are derived from statistical studies are just as reliable as other categories of evidence in personal injury cases).

### C.

In considering the loss of chance doctrine, we "would be remiss if we did not at least provide some minimal guidance with respect to the measure of damages in such a case." *McMackin*, 73 P.3d at 1100. The first step in a loss of chance case is to measure the chance lost. Put differently, "loss of chance damages are measured as 'the percentage probability by which the defendant's tortious conduct diminished the likelihood of achieving some more favorable outcome.'" *Matsuyama*, 890 N.E.2d at 839 (quoting King, *supra*, at 1382). Assessing loss of chance damages necessarily depends, to a certain extent, on the available medical evidence. *Id.* at 838–39. In this case, based on Dr. Forman's expert medical opinion, the relevant medical standard to measure loss of chance is the 5–year survival rate for ARS.

The second step is to value the lost chance. Those jurisdictions that have recognized loss of chance as a distinct and compensable injury have tended to adopt the proportional-recovery approach. *See, e.g., Cahoon v. Cummings*, 734 N.E.2d 535, 540–41 (Ind.2000) (concluding that the "better approach" to damages in a loss of chance case is proportional recovery). Under the proportional-recovery rule, damages for the patient's injury or death are discounted by the value of the chance that the physician's negligence destroyed. *See id.;* Dobbs et al., *supra*, § 196, at 66–67. Such an approach to damages is the most "equitable method of apportioning damages consistent with the degree of fault attributable to the health care provider," *Roberts v. Ohio Permanente Medical Group, Inc.*, 76 Ohio St.3d 483, 668 N.E.2d 480, 484 (1996), and minimizes the risk

---

14. The dissent asserts that "the majority's decision greatly expands the liability of medical professionals." The dissent's assertion is belied by the fact that nearly half the states have adopted some form of the loss of chance doctrine, and the available empirical evidence establishes that a state's adoption of the loss of chance doctrine has "no significant impact on either court docket congestion or medical malpractice insurance costs." Steven R. Koch, Comment, *Whose Loss Is It Anyway? Effects of the "Lost–Chance" Doctrine on Civil Litigation and Medical Malpractice Insurance*, 88 N.C. L.Rev. 595, 602 (2010).

that the health care provider is "assessed damages for harm that he did not cause," *Matsuyama*, 890 N.E.2d at 840. We agree with those jurisdictions that have adopted the proportional-recovery approach to damages in loss of chance cases. Accordingly, under our view of the loss of chance doctrine, the total amount of damages recoverable is equal to the percentage chance of survival or cure lost, multiplied by the total amount of damages allowable for the death or injury.[15] *See, e.g., Mead v. Adrian*, 670 N.W.2d 174, 188 (Iowa 2003) (Cady, J., concurring specially) (explaining the proportional-recovery rule).

This case, of course, is different. Jocelyn's cancer has recurred and her death is very likely, but not certain. Fortunately, Jocelyn is still alive at the time of this appeal. Because this is not a death case at this point in time, the appropriate baseline to determine loss of chance damages for Jocelyn's injury is not the total amount of damages allowable for death. Rather, the appropriate measure of damages is the value of the reduction of the plaintiff's life expectancy from her pre-negligence life expectancy. *See Alexander*, 726 N.E.2d at 282–83 (recognizing decrease in life expectancy itself as a compensable injury when the physician failed to diagnose cancer); *see also James v. United States*, 483 F.Supp. 581, 587 (N.D.Cal.1980); *United States v.*

*Anderson*, 669 A.2d 73, 78 (Del.1995) (allowing recovery for shortened life expectancy as a result of increased risk of death from a physician's alleged failure to timely diagnose testicular cancer). In other words, assuming the fact-finder concludes that the appellants' negligence reduced Jocelyn's life expectancy, the fact-finder must determine the amount of damages necessary to compensate Jocelyn for that reduction in life expectancy. While we recognize that this task is not easy, it is the type of duty that courts routinely delegate to juries in personal injury cases.[16] *See Alexander*, 726 N.E.2d at 283 (explaining that "[v]aluing a determinable number of years of life is no more challenging than" awarding damages for other injuries that are "not readily calculable"); *DePass*, 721 F.2d at 209 (Posner, J., dissenting) (arguing that statistical evidence of a reduction in life expectancy "provides a perfectly objective basis for awarding damages").

In sum, we are confident that, properly understood, recognizing loss of chance as a compensable injury in medical malpractice cases will advance, not undermine, the fundamental purposes of tort law: deterrence and compensation. *See, e.g., Pletan v. Gaines*, 494 N.W.2d 38, 42 (Minn.1992) (explaining that "[t]ort liability seeks to compensate the injured and to deter wrongdoing"). For the foregoing

---

**15.** For example, assume that a physician negligently fails to diagnose a patient's cancer. The patient dies. If the patient had only a 40 percent chance of survival before the medical malpractice, but the physician's negligence reduced her chance of survival to 0 percent, then the physician should be liable for 40 percent of the damages, or the portion of the value that the defendant's negligence destroyed. *See* Dobbs et al., *supra*, § 196, at 666–67. If the fact-finder determines that total damages for the patient's death are $100,000, then the patient's loss of chance damages would be $40,000.

**16.** As in every medical negligence case, Jocelyn retains the burden of proving damages caused by the defendant by a fair preponderance of the evidence. *See Carpenter v. Nelson*, 257 Minn. 424, 427, 101 N.W.2d 918, 921 (1960). And, as we have explained many times, in the case of future damages, a plaintiff like Jocelyn at all times retains the burden of proving such damages "to a reasonable certainty." *Pietrzak v. Eggen*, 295 N.W.2d 504, 507 (Minn.1980).

reasons, we conclude that Minnesota law permits a patient to recover damages when a physician's negligence diminishes or destroys a patient's chance of recovery or survival. Therefore, we hold that the district court erred when it dismissed Jocelyn's medical malpractice action on the ground that the Dickhoffs' claim was prohibited under Minnesota law.

### III.

■■■ Having concluded that the Dickhoffs are advancing a "loss of chance" claim—a claim that is cognizable in Minnesota—we must now consider whether the district court was nevertheless correct in ruling that the Dickhoffs' expert medical testimony failed, as a matter of law, to establish a prima facie case of causation.

To establish a prima facie case of medical malpractice, we have consistently held that "a plaintiff must prove, among other things, that it is more probable than not that his or her injury was a result of the defendant health care provider's negligence." *Leubner*, 493 N.W.2d at 121. We conclude that the Dickhoffs have created a genuine issue of material fact on the issue of causation, and therefore the district court erred by granting summary judgment in favor of the appellants.

■■■ Under our view of the loss of chance doctrine, a patient retains the burden of proving by the traditional preponderance of the evidence standard that the physician's negligence substantially reduced the patient's chance of recovery or survival. *See Lord*, 770 A.2d at 1107; Dobbs et al., § 196, at 666. Therefore, our approach to the loss of chance doctrine is consistent with our enduring approach to causation in medical malpractice cases. For that reason, we reject the court of appeals' suggestion that a medical malpractice plaintiff establishes a prima facie case of causation by demonstrating that

physician error, no matter how slight, dropped the odds of the plaintiff's survival below a 50 percent threshold. The court of appeals, relying on dicta from our decision in *MacRae*, held that "the Dickhoffs must prove only that Jocelyn's chances of death from her cancer moved from unlikely to likely." *Dickhoff*, 811 N.W.2d at 115. The troubling consequence of the court of appeals' holding is that a plaintiff whose odds of survival drop from 51 percent to 49 percent has a cognizable medical malpractice claim, while a patient whose odds of survival are reduced from 49 percent to 0 percent as a result of a physician's negligence is unable to ever establish, as a matter of law, that the physician caused any harm. We conclude that such an approach is unreasonable. Such a rule also is inconsistent with our repeated exhortation that a plaintiff must prove that the defendant health care provider's *negligence* more likely than not caused the claimed injury. *Leubner*, 493 N.W.2d at 121; *Smith v. Knowles*, 281 N.W.2d 653, 656 (Minn.1979).

In this case, we conclude that Dr. Forman's affidavits are sufficient to create a genuine issue of material fact on causation. Dr. Forman asserts that Dr. Tollefsrud's failure to timely diagnose Jocelyn's cancer caused a substantial increase in the likelihood that Jocelyn's cancer would recur and decreased her chances of survival by at least 20 percent, and he bases his conclusion on an analysis of the particular characteristics of Jocelyn's cancer and its progression. In other words, the Dickhoffs have produced evidence establishing that Jocelyn's prospects for achieving a more favorable outcome, as measured in terms of her likelihood of surviving for a number of years under the relevant medical standard—the 5—year survival rate for ARS—were reduced by Dr. Tollefsrud's negligence. In addition, Dr. Forman's affida-

vits state that the delay in diagnosis caused Jocelyn to undergo additional medical treatments based on the recurrence of her cancer that she would not have otherwise undergone.[17]

Accordingly, we conclude that the Dickhoffs have produced admissible testimony that shows it is more probable than not that Jocelyn's injury—the loss of chance of survival—was a result of Dr. Tollefsrud's negligence. Because the Dickhoffs have created a genuine issue of material fact on the issue of causation, we hold that the district court erred by granting summary judgment in favor of the appellants.

Affirmed.

ANDERSON, G. BARRY and WRIGHT, JJ., took no part in the consideration or decision of this case.

DIETZEN, Justice (dissenting).

This is a tragic case. Jocelyn Dickhoff was born with a rare and aggressive form of childhood cancer that puts her young life at risk. I am acutely aware that the disputes between the parties in the courtroom are insignificant in comparison to the struggle that Jocelyn faces outside of it. But against this weighty background, we must decide the relatively modest issue of whether, on the present record, there is sufficient expert medical testimony to prove that Dr. Rachel Tollefsrud directly caused any of Jocelyn's injuries. It is a cardinal principle of tort law and fundamental fairness that a "defendant should be responsible only for the injuries that are legally *caused by* the defendant's negligence." *Rowe v. Munye,* 702 N.W.2d 729, 742 (Minn.2005) (emphasis added). The majority disregards this cardinal prin-

ciple and introduces speculation by concluding that a physician may be liable for harms not directly caused by the physician's negligence, but caused by the patient's underlying disease. In so doing, the majority sua sponte overrules long standing precedent and upsets an unbroken tradition of tort law in this state. Therefore, I must respectfully dissent.

## I.

To properly analyze this case, it is important first to identify the precise injuries or harms for which the Dickhoffs seek compensation. The Dickhoffs concede that Dr. Tollefsrud should not have to compensate them for Jocelyn's initial cancer treatments because she would have required those same treatments even if the cancer had been diagnosed immediately. But the Dickhoffs contend that Dr. Tollefsrud should have to compensate them for two other categories of damages. Specifically, they allege that Dr. Tollefsrud's negligence caused a delay in the diagnosis and treatment of Jocelyn's cancer, which decreased her odds of ultimately surviving her disease from 60% to 40%, and made her more likely to suffer a recurrence of her cancer. Therefore, the Dickhoffs seek compensation for (1) the cost of medical treatment related to the 2010 recurrence of Jocelyn's cancer, as well as pain and suffering that Jocelyn experienced as a result of that treatment; and (2) Jocelyn's decreased chance of surviving the cancer in the future and the probability that she will die from the disease.

As the majority aptly puts it, "the injury that lies at the heart of the Dickhoffs' medical malpractice action is a claim that Dr. Tollefsrud's alleged negligence in-

17. We recognize that the Dickhoffs still face an uphill battle in proving the existence of the injury and causation. But we simply hold today that plaintiffs like the Dickhoffs should have an opportunity to prove both. Such an opportunity is consistent with our longstanding approach to tort law.

creased the risk that Jocelyn's cancer would recur and decreased her chances of survival." Although the Dickhoffs do not characterize it as such, I agree with the majority that this is a quintessential "loss of chance" claim. But in light of our precedent, I disagree with the majority's conclusion that a loss of chance claim is cognizable in Minnesota. We have explicitly rejected loss of chance as a theory of recovery in two cases, and we are bound by that precedent. *Fabio v. Bellomo,* 504 N.W.2d 758 (Minn.1993); *Leubner v. Sterner,* 493 N.W.2d 119 (Minn.1992). The majority overrules these decisions without either party requesting that we do so, and without providing any compelling justification for the abandonment of our precedent. But even if we were unconstrained by precedent, I would decline to adopt the loss of chance doctrine because it unfairly holds physicians like Dr. Tollefsrud liable for harms that may never materialize and, if they do occur, are not proximately caused by the physician's negligence.

### A.

In considering whether the Dickhoffs can recover for loss of chance, we do not write on a clean slate. We have considered the viability of a loss of chance claim in two previous cases: *Leubner v. Sterner,* 493 N.W.2d 119 (Minn.1992) and *Fabio v. Bellomo,* 504 N.W.2d 758 (Minn.1993). In both cases we expressly declined to adopt the loss of chance doctrine in Minnesota under facts comparable to the present case.

In *Leubner,* the plaintiff was referred to Dr. Ronald Jensen after her family doctor confirmed two small lumps in her breast. 493 N.W.2d at 120. Dr. Jensen examined plaintiff but did not order a biopsy. *Id.* At a follow-up appointment 6 months later,

Dr. Jensen noticed the nodules were enlarged and advised a biopsy, which revealed cancer. *Id.* A partial mastectomy was performed. *Id.* Unfortunately, plaintiff experienced several recurrences of cancer, ultimately resulting in a total mastectomy and the removal of two additional lesions on the wall of her chest. *Id.* Plaintiff sued Dr. Jensen and presented an expert witness who opined that, had plaintiff been diagnosed and treated for cancer after her first visit to Dr. Jensen, "she would possess an increased chance of survival from her disease of breast cancer, in contrast to [her] present chance of survival." *Id.* In particular, plaintiff's expert opined that, as a result of the delay, plaintiff's 5-year survival rate had decreased from approximately 96% to 80%.[1]

Dr. Jensen moved for summary judgment and the district court granted the motion. Specifically, the court rejected plaintiff's claim under a loss of chance theory and concluded that plaintiff generally "failed to establish that it was more likely than not that the specified consequences resulted from the alleged negligence." *Leubner,* 493 N.W.2d at 120. The court of appeals reversed, and Dr. Jensen sought review from this court, asserting that plaintiff failed to present a prima facie case of causation. *Id.* at 120–21.

We noted that, in order to establish a prima facie case of medical malpractice, a plaintiff must prove "that it is more probable than not that his or her injury was a result of the defendant health care provider's negligence." *Id.* at 121. But we observed that "causation cannot be discussed intelligently without reference to the injury claimed to be caused." *Id.* If the injury claimed is plaintiff's death, we stated, the offer of proof failed because "there is no

---

1. These figures do not appear in the court's opinion, but are set forth in the opinion of the court of appeals. *Leubner v. Sterner,* 483 N.W.2d 518, 520 (Minn.App.1992).

proof it is more probable than not that plaintiff will not survive her cancer." *Id.* Indeed, we noted that the plaintiff's own expert believed that death is overwhelmingly improbable. *Id.* We also addressed whether plaintiff's claim could proceed based on the reduction of her odds of survival (*i.e.*, loss of chance):

> Arguably, the injury claimed to be caused is a decreased percentage chance of surviving, whether or not the patient, in fact, has survived. *Here the difficulty is perhaps not so much in proving causation as "more probable than not," but in what appears to be the amorphous and speculative nature of the asserted "injury,"* especially as it applies to a particular patient.

*Id.* (emphasis added). In other words, we concluded that the mere reduction in the patient's odds of survival due to the delay in diagnosis was too speculative of an injury to be independently compensable.[2] Finally, we concluded that plaintiff could not recover for the recurrence of her cancer and resulting surgery and treatment, because her expert evidence did not show that it was more probable than not that her recurrence was caused by Dr. Jensen's negligence. *Id.* at 122.

We were even more explicit in our rejection of the "loss of chance" doctrine in *Fabio*. In that case, Dr. James Bellomo twice examined a lump in plaintiff's left breast but told her not to worry about it because it was a fibrous mass. *Fabio*, 504 N.W.2d at 760. Plaintiff later saw another physician who ordered a mammogram. *Id.* The mammogram revealed two tumors, and a biopsy revealed that the tumors were cancerous and had metastasized to her lymph nodes. *Id.* Plaintiff sued Dr. Bellomo, alleging that he negligently failed to diagnose her breast cancer, which caused her to suffer three forms of damages, including damages arising from a " 'loss of chance' of life expectancy and a greater risk of recurrence of cancer." *Id.* at 761. Plaintiff offered expert testimony that, because of the delay in treating her cancer, her risk of recurrence had risen from as low as 15% to 30% or greater,[3] and her chance for surviving had fallen but remained above 50%. The district court ruled that no cause of action existed for loss of chance, and the court of appeals affirmed. *Fabio*, 504 N.W.2d at 761.

We granted review and affirmed. *Id.* at 760–61. We directly addressed plaintiff's allegation that "loss of chance" was a compensable "form[ ] of damage" from the failure to diagnose the cancer. *Id.* at 761–62. But we again rejected loss of chance as a theory of recovery:

> Fabio's second theory of recovery is for "loss of chance." She argues that her

**2.** The majority contends that we did not address loss of chance in *Leubner* because the issue was waived by plaintiff on appeal. Although we noted in *Leubner* that plaintiff did not file a petition for review to preserve their lost chance of survival claim, we nonetheless proceeded to address whether plaintiff could recover on that theory. In so doing, we rejected the argument that *"the injury claimed to be caused is a decreased percentage chance of surviving, whether or not the patient, in fact, has survived."* 493 N.W.2d at 121 (emphasis added). This is the precise injury that the majority recognizes as compensable in this case. The majority dismisses our determination in *Leubner* on the ground that it was

mere "dicta." But the fact remains that, in *Leubner*, we denied any recovery to a plaintiff on virtually identical facts to this case. No matter how the plaintiff chose to characterize her injury or legal theory, we held that it could not proceed because she could not show that the injury was the result of the defendant's negligence. The majority's decision ignores this rule of law.

**3.** These figures do not appear in the court's opinion, but are set forth in the opinion of the court of appeals. *Fabio v. Bellomo*, 489 N.W.2d 241, 243 (Minn.App.1992).

increased chance of recurrence of cancer and her decreased chance of living another 20 years are compensable injuries. We have never recognized loss of chance in the context of a medical malpractice action, and we decline to recognize it in this case.

*Id.* at 762. We acknowledged that a plaintiff may recover for future damages or consequences of a defendant's negligence when the probability of the future damage was proven with reasonable medical certainty and the future damage was caused solely by the initial injury inflicted by the defendant. *See id.* at 763. But we noted that Fabio's "initial 'injury,' her cancer, did not result from a misdiagnosis by Dr. Bellomo, and a misdiagnosis by Dr. Bellomo could not have been the sole cause of any future ill effects." *Id.* Moreover, we noted that, "even if we were to adopt loss of chance as a theory of recovery in medical malpractice actions," it would not apply to plaintiff because there was no evidence that it was more likely than not that her cancer would recur or that she would not survive. *Id.* Indeed, the evidence showed that she had at least a 50% chance of survival and about a 70% chance that her cancer would not recur. *See id.* Therefore, we held that the district court properly granted summary judgment on the loss of chance claim.[4] *Id.* at 763.

In this case, the majority concedes that our opinion in *Fabio* "intimated" that we were conclusively rejecting loss of chance as a theory of tort recovery. Nevertheless, the majority concludes that it is not bound by our rejection of the doctrine for two related reasons. First, the majority claims our rejection of loss of chance in *Fabio* was motivated by the specific facts of that case. But the majority conspicu-

ously fails to explain how the facts of the Dickhoffs' case are meaningfully distinguishable from the facts of *Fabio.* Both cases involve allegations that a doctor negligently failed to diagnose an unidentified "lump" as cancer and that, as a result of the delay, the risk of both cancer recurrence and death increased. Even the percentage chance lost is nearly identical: as much as 15% chance lost in *Fabio* versus a 20% chance lost here. The majority fails to acknowledge any of these similarities, and does not cite a single distinguishing fact between this case and *Fabio.* Because *Fabio* is factually indistinguishable from this case, our rejection of the loss of chance theory "in that case" also controls here.

Second, the majority reasons it is not bound by *Fabio's* rejection of loss of chance because it was "mere dictum." The majority notes that we offered two alternative justifications for our holding in *Fabio:* (1) that we declined to recognize loss of chance, and (2) that even if we were to recognize loss of chance, the plaintiff had not presented sufficient evidence to make out such a claim. The majority therefore reasons that "[n]either justification was necessary to our decision in *Fabio,*" and thus the rejection of the loss of chance doctrine is "dictum." I disagree with this analysis.

Under the majority's reasoning, *both* of the alternative grounds in *Fabio* would be dictum, because neither justification was necessary to the decision in light of the existence of the other. But that result defies logic and would mean that no rule of law can be discerned from *Fabio* at all. In fact, we have explicitly rejected such reasoning. In *State ex rel. Foster v. Naftalin,* we stated:

---

4. We reaffirmed *Fabio's* holding in *MacRae v. Group Health Plan, Inc.,* 753 N.W.2d 711, 722 (Minn.2008) ("We rejected 'loss of chance' due to reduced life expectancy and increased risk of recurrence as a theory of compensable damages....").

Where ... two or more issues are before the court and are argued by counsel, and the court places its decision on both even though a decision on one issue might have been sufficient to dispose of the case, the decision is equally binding as to both issues.

246 Minn. 181, 208, 74 N.W.2d 249, 266 (1956);[5] *see also State v. Rainer,* 258 Minn. 168, 178, 103 N.W.2d 389, 396 (1960) (stating that "even though a case might have been decided on another theory it does not render what was said in the court's opinion 'obiter dictum' if what was said bears directly upon the theory upon which the decision proceeded and upon an issue of law treated as decisive"). "Dicta" is a term of art that generally refers to expressions in an opinion "which go beyond the facts before the court and therefore are the individual views of the author of the opinion." *Naftalin,* 246 Minn. at 208, 74 N.W.2d at 266. The statements in *Fabio* clearly do not meet this definition of dicta, as they squarely addressed the facts and legal issues before the court and were not the mere views of the author of the opinion.

The majority's disregard for *Fabio* is even more egregious in light of the fact that the majority fails to acknowledge that we also rejected loss of chance in *Leubner,* where we noted that a plaintiff cannot recover for the decreased percentage chance of surviving itself as an item of damage, because the reduced chance is too "amorphous and speculative" of an injury. *Leubner,* 493 N.W.2d at 121. We are bound by principles of stare decisis to follow *Leubner* and *Fabio.* In short, the majority is simply wrong to conclude that we have never definitively decided whether to recognize a loss of chance claim.

B.

Given that we rejected the loss of chance doctrine in *Leubner* and *Fabio,* the Dickhoffs can only recover for such a claim if we overrule those precedents. But we have consistently stated that we are "extremely reluctant" to overrule our precedent under principles of stare decisis, *Oanes v. Allstate Ins. Co.,* 617 N.W.2d 401, 406 (Minn.2000), and " 'require a compelling reason' before overruling a prior decision," *Cargill, Inc. v. Ace Am. Ins. Co.,* 784 N.W.2d 341, 352 (Minn.2010) (quoting *State v. Martin,* 773 N.W.2d 89, 98 (Minn. 2009)). This is because stare decisis promotes stability in the law, *see Cargill,* 784 N.W.2d at 352, as well as " 'the evenhanded, predictable, and consistent development of legal principles, ... reliance on judicial decisions, and ... the actual and perceived integrity of the judicial process,' " *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 63, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) (quoting *Payne v. Tennessee,* 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991)). As we stated more than 50 years ago:

Government by law instead of by man, which is the main bulwark to our democratic form of government, demands a decent respect for the rule of stare decisis in order that citizens of this state will

---

**5.** The majority's reference to a footnote in *Curtis v. Altria Group, Inc.,* 813 N.W.2d 891 (Minn.2012) does not support its position. At best, that footnote states that, when a court is faced with alternative arguments, a decision resting on the *first* argument renders a decision on the *second* argument dictum. *See Curtis,* 813 N.W.2d at 901 n. 6. But in *Fabio,* the primary and first-articulated basis for our decision was our categorical rejection of the loss of chance doctrine. *See* 504 N.W.2d at 762. The second basis was our conclusion that "even if" we adopted the doctrine, plaintiff had not proven such a claim. *See id.* at 763. Therefore, even under the *Curtis* footnote, *Fabio's* rejection of the loss of chance doctrine is the holding and the plaintiff's failure to prove such a claim was dictum.

be assured that decisions of the court are good for more than "one trip and one day only."

*Naftalin,* 246 Minn. at 205, 74 N.W.2d at 264. Although the majority overrules *Fabio* and *Leubner* on the issue of the loss of chance doctrine, it does not explicitly acknowledge that it is doing so. As such, the majority sidesteps the need to provide a "compelling reason" for departing from our precedent.

In my view, this case is a poor vehicle for departing from our precedent because the Dickhoffs themselves never requested that we recognize loss of chance or overrule *Fabio* and *Leubner.* Indeed, in their brief to this court, the Dickhoffs repeatedly assert that they "have presented a traditional tort negligence claim." They explicitly disavow a loss of chance theory and state that they "are not presenting what is referred to as a loss of chance case, either under a causation or damages analysis." Because the Dickhoffs do not purport to assert a loss of chance claim, neither party has briefed the issue of whether *Fabio* and *Leubner* should be overruled or whether loss of chance should be adopted. The majority has undertaken to overrule these cases sua sponte despite the fact that the issue was not squarely presented for our consideration and we do not have the benefit of the adversarial process or arguments of the parties in making our decision.[6] Sound judicial principles dictate that we should not render a decision on important legal issues that have not been properly developed. *See Broehm v. Mayo*

*Clinic Rochester,* 690 N.W.2d 721, 728 (Minn.2005) (noting that we generally decline to consider issues that are not adequately briefed on appeal); *Balder v. Haley,* 399 N.W.2d 77, 80 (Minn.1987) (stating that issues not argued in briefs must be deemed waived on appeal); *see also In re Welfare of K.T.,* 327 N.W.2d 13, 16–17 (Minn.1982) (stating that "a party may not raise for the first time on appeal a matter not presented to the court below").

## C.

But even if the Dickhoffs had asked that we revisit our precedent and reconsider our rejection of loss of chance, I can discern no compelling reason to overrule *Fabio* and *Leubner.* Specifically, the loss of chance doctrine that the majority adopts today undermines traditional tort principles of causation and violates fundamental fairness by holding physicians liable for harms that are not caused by their negligence.

### 1.

There are three essential elements of a medical malpractice claim. A plaintiff must prove: "(1) the standard of care recognized by the medical community as applicable to the particular defendant's conduct, (2) that the defendant in fact departed from that standard, and (3) that the defendant's departure from the standard was a direct cause of [the patient's] injuries." *MacRae v. Grp. Health Plan, Inc.,* 753 N.W.2d 711, 717 (Minn.2008) (quoting *Plutshack v. Univ. of Minn. Hosps.,* 316 N.W.2d 1, 5 (Minn.1982)). For the pur-

6. The majority contends that the adoption of loss of chance was "squarely presented for our consideration" despite the fact that, in more than 100 pages of briefing, the parties did not address the primary rationales upon which the majority bases its decision. Specifically, neither the Dickhoffs nor Dr. Tollefsrud meaningfully addressed whether the court is bound by *Fabio* and *Leubner;* whether traditional tort rules adequately deter medical negligence; whether loss of chance should be treated as a distinct injury; and whether medical science has progressed to the point where physicians can accurately estimate chances of survival. Therefore, the majority's claim that the adoption of loss of chance has been squarely presented for our consideration lacks credibility.

pose of this appeal, only the third element—that the physician's negligence was a direct cause of the patient's injuries—is in dispute. We have stated that, in order to prove causation, a plaintiff must introduce expert medical testimony that establishes that it was more probable than not that the injuries for which compensation is sought resulted from the physician's negligence. *Cornfeldt v. Tongen*, 295 N.W.2d 638, 640 (Minn.1980). The injuries or harms can be things that have already materialized or come to pass at the time suit is brought; or, in certain circumstances, the injuries or harms can be things that the plaintiff proves are more likely than not to materialize in the future (*i.e.*, future damages). *See Pietrzak v. Eggen*, 295 N.W.2d 504, 507 (Minn.1980); *see also Carpenter v. Nelson*, 257 Minn. 424, 428, 101 N.W.2d 918, 921 (1960); 4A Minn. Dist. Judges Ass'n, *Minnesota Practice–Jury Instruction Guides, Civil*, CIVJIG 91.25 (future damages for bodily harm), 91.30 (future medical expenses), 91.35 (future earnings) (5th ed.2006).

But whether the doctor caused the (present or future) injury in medical malpractice cases based on a physician's failure to timely diagnose is difficult to determine because the patient is suffering from a preexisting condition—namely, the underlying disease—in this case, cancer. The plaintiff in a failure-to-timely-diagnose case does "no[t] claim the disease itself, the cancer, was caused by the physician," *Leubner*, 493 N.W.2d at 122; *see also Fabio*, 504 N.W.2d at 763, and it is the underlying disease, not the physician, that directly inflicts the actual harm on the patient.

In light of this problem, we have stated that it is the "policy" of this state, and a fundamental principle of tort law, that a "defendant should be responsible only for the injuries that are legally caused by the defendant's negligence." *Rowe*, 702 N.W.2d at 739, 742. In cases where a plaintiff has a preexisting disease or condition, it is unfair to force the defendant to pay for the effects of that preexisting condition. *See id.* at 742. Therefore, we have held time and again that the "plaintiffs have the burden of showing that 'it was more probable that [injury] *resulted from some negligence for which defendant was responsible than from something for which he was not responsible.*'" *Plutshack v. Univ. of Minn. Hosps.*, 316 N.W.2d 1, 7 (Minn.1982) (alteration in original) (emphasis added) (quoting *Silver v. Redleaf*, 292 Minn. 463, 465, 194 N.W.2d 271, 273 (1972)); *accord Harvey v. Fridley Med. Ctr., P.A.*, 315 N.W.2d 225, 227 (Minn. 1982).

Of course, a plaintiff may recover "where a pre-existing disease is aggravated by the negligence of another person." *Nelson v. Twin City Motor Bus Co.*, 239 Minn. 276, 280, 58 N.W.2d 561, 563 (1953). But in such cases, "we have required the defendant to pay only for the damages he or she caused over and above the consequences that would have occurred from the preexisting injury if the [defendant's negligence] had not occurred." *Rowe*, 702 N.W.2d at 736; *see also Schore v. Mueller*, 290 Minn. 186, 189, 186 N.W.2d 699, 701 (1971); *Nelson*, 239 Minn. at 280, 58 N.W.2d at 563 (stating that "the victim's recovery in damages is limited to the additional injury caused by this aggravation over and above the consequences which the pre-existing disease, running its normal course, would itself have caused if there had been no aggravation by negligent injury"). The burden of proof, however, remains on the plaintiff to segregate her damages and identify which specific compensable harms were the result of defendant's aggravation of her disease, as opposed to those that were the result of the disease itself. *See Rowe*, 702 N.W.2d

at 736; *Leubner*, 493 N.W.2d at 122. A jury must not be permitted to speculate as to the actual cause of the harm: the disease or the doctor. *See Cornfeldt*, 295 N.W.2d at 640–41.

Here, the injury or harm for which the Dickhoffs seek compensation is, in their own words, "the shortening of [Jocelyn's] life" or her "imminent death." But this harm has not yet come to pass. I will assume for the sake of argument that it could, in theory, be a compensable form of future damage under traditional tort principles.[7] The Dickhoffs have offered expert medical evidence that this harm will more likely than not materialize in the future (*i.e.*, that death is likely). Dr. Edwin Forman opined that Jocelyn's likelihood of survival is 40%, versus a 60% chance that she will die. But where the Dickhoffs' proof fails is in showing that, if Jocelyn dies, her death or shortened life will have been *caused by* something for which Dr. Tollefsrud is responsible (the allegedly negligent delay in diagnosis) rather than caused by something for which Dr. Tollefsrud is not responsible (the natural progression of the disease itself). *See Plutshack*, 316 N.W.2d at 7. Put differently, the Dickhoffs improperly attempt to use expert testimony that it is more likely than not that Jocelyn will have a shortened life to satisfy the requirement that they prove that the shortened life (if it occurs) will have been directly caused by the failure to diagnose.

In Dr. Forman's opinion, Dr. Tollefsrud's actions reduced Jocelyn's likelihood of survival from 60% to 40%. In other words, Jocelyn always had at least a 40% chance of death even if she had been timely diagnosed, but she gained an additional 20% chance of death due to the delay in diagnosis. Jocelyn now has an overall 60% chance of dying from the cancer, of which two-thirds (40/60) is attributable to the cancer itself even without the delay in diagnosis, and one-third (20/60) is attributable to the allegedly negligent delay in diagnosis. This means that, even under the Dickhoffs' own evidence, Jocelyn's death, if it occurs, is very *probably* (66.7% or 40/60) attributable to the underlying cancer that she was born with, and *unlikely* (33.3% or 20/60) attributable to anything that Dr. Tollefsrud did. Put simply, the Dickhoffs are seeking to hold Dr. Tollefsrud legally responsible for something that she likely did not cause.

The Dickhoffs' proof of causation similarly fails with respect to the April 2010 recurrence of Jocelyn's cancer and resulting treatments. On this point, Dr. Forman's third affidavit admitted that it was "impossible to put precise statistics" on the likelihood of recurrence with or without timely care, but nonetheless asserted that Dr. Tollefsrud's failure to timely diagnose the disease was "to blame for the recurrence" because it "changed the likelihood of recurrence and need for additional care from unlikely to probable." But Dr. Forman's opinion is purely conclusory. It

7. Appellants contend that a party cannot maintain a cause of action seeking compensation for her future death—no matter how probable—during her lifetime. In particular, appellants argue that such a claim is essentially one for wrongful death, which did not exist at the common law and is entirely a creature of statute. *See Beck v. Groe*, 245 Minn. 28, 45, 70 N.W.2d 886, 897 (1955). While a party may recover for damages incurred before death (such as medical expenses and pain and suffering), the claim for death itself does not exist during a person's lifetime because it "is *created* by the decedent's death." *Regie de l'assurance Auto. du Quebec v. Jensen*, 399 N.W.2d 85, 89 (Minn. 1987). As noted above, I need not decide this issue now and I will assume for the sake of argument that damages for Jocelyn's eventual death (or decreased length of life) could be recoverable as an item of future damages under traditional tort principles.

does not set out the factual or scientific basis for the opinion or explain how he was able to conclude that the recurrence is more likely than not due to Dr. Tollefsrud rather than the natural progression of the cancer even with timely diagnosis. As such, the opinion does not begin to meet the minimum requirements of "foundational reliability" required by our rules. Minn. R. Evid. 702. We require more from experts in medical malpractices cases. *See Lindberg v. Health Partners, Inc.,* 599 N.W.2d 572, 577–78 (Minn.1999) (noting that an expert's affidavit must contain more than "broad and conclusory statements as to causation" and should "outline a chain of causation" connecting the negligence with the injury); *Stroud v. Hennepin Cnty. Med. Ctr.,* 556 N.W.2d 552, 556 (Minn.1996). Therefore, the Dickhoffs failed to prove that Dr. Tollefsrud caused Jocelyn's April 2010 recurrence of cancer.

The majority essentially concludes that expert medical testimony that Dr. Tollefsrud directly caused the shortened lifespan and recurrence of cancer is no longer necessary. Instead, proof that Jocelyn's chances of survival may have dropped 20% plus rank speculation regarding the cause of the recurrence of cancer is deemed sufficient, thus undermining this state's policy that a "defendant should be responsible only for the injuries that are legally caused by the defendant's negligence." *See Rowe,* 702 N.W.2d at 742. In practice, the majority's opinion allows plaintiffs to recover merely upon proof that they have suffered any non-de minimis reduction in their chance of recovery or survival, even if it is exceedingly unlikely that the physician can be shown to have caused the ultimate harm. For example, the majority's opinion would seemingly allow a plaintiff to recover whose chance of survival has been reduced from 20% to 10%, even though, if the plaintiff dies, there will be only an 11% chance (10/90) that the harm is attributable to the doctor. Holding physicians liable when they are highly unlikely to have caused the ultimate harm is contrary to cardinal tort principles and is fundamentally unfair. Although I do not deny the harshness of denying compensation to a young child who alleges that her doctor's negligence diminished her chance of survival and recovery, the importance of causation as a limiting principle for tort liability cannot be ignored. As one jurist aptly stated:

> The combination of the loss of a loved one to cancer and a doctor's negligence in diagnosis seems to compel a finding of liability. Nonetheless, justice must be dealt with an even hand. To hold a defendant liable without proof that his actions *caused* plaintiff harm would open up untold abuses of the litigation system.

*Herskovits v. Grp. Health Coop. of Puget Sound,* 99 Wash.2d 609, 664 P.2d 474, 491 (1983) (Brachtenbach, J., dissenting).

2.

As a justification for departing from these traditional and fundamental rules, the majority attempts to recast the "injury" at issue. According to the majority, the injury is not the *actual* shortening of Jocelyn's life or the *actual* recurrence of her cancer; rather, the "reduction of a patient's chance of recovery or survival [is] a distinct injury." In other words, with respect to the decrease in Jocelyn's odds of survival, the majority holds that the 20% reduction in her chance of survival is *itself* the harm, regardless of whatever actually comes to pass or whether Jocelyn ultimately survives. And because, according to the majority, Dr. Tollefsrud's negligence *caused* the 20% reduction, the Dickhoffs can recover for that lost 20% even if the ultimate harm (death or shortened life) never materializes or the physician did not

cause the ultimate harm. In sum, the majority seeks to mask its alteration of traditional causation requirements by casting its opinion instead as a redefinition of the concept of recoverable damages.

I cannot accept this premise. While I agree with the majority in the abstract that a patient "values" her chances for survival, that fact alone does not render every reduction of that chance a compensable "injury." Imagine, for example, a patient who undergoes surgery for which the doctor negligently fails to disclose a 20% chance of death on the operating table. But the patient survives the surgery and does not die on the operating table. Although the patient surely would not have been indifferent to the increased 20% chance of death in choosing to undergo the surgery, having escaped harm the patient has not suffered a compensable injury. *See K.A.C. v. Benson*, 527 N.W.2d 553, 561 (Minn.1995) (plaintiff must show that risk "actually materialized in harm"). That is because the "chance" only has meaning with reference to the actual outcome. The true harm or injury to the plaintiff is the death. *See Kramer v. Lewisville Mem'l Hosp.*, 858 S.W.2d 397, 403 n. 5 (Tex.1993); *see also Fennell v. S. Md. Hosp. Ctr., Inc.*, 320 Md. 776, 580 A.2d 206, 213 (1990) ("[I]t would seem that the true injury is the death."). And if the doctor cannot be said to have caused the ultimate injury (if it ever occurs), of what relevance is it that the doctor can be said to have caused the loss of chance?

In other words, the majority has concocted a legal fiction in order to obscure

the very real causation problem in this case. The loss of chance is not an injury that the law should recognize as compensable. We recognized this is *Leubner*, when we rejected the idea that the "decreased percentage chance of surviving" may itself be "the injury claimed to be caused." *See* 493 N.W.2d at 121. We stated that "[h]ere the difficulty is perhaps not so much in proving causation as 'more probable than not,' but in what appears to be *the amorphous and speculative nature of the asserted 'injury.'* " *Id.* (emphasis added).

The majority contends that treating the lost chance of survival as a compensable injury in itself promotes the fundamental aims of tort law, "including compensation for victims of medical negligence and the deterrence of unsafe conduct by health care providers." I disagree. As to compensation, the loss of chance doctrine as articulated by the majority has several problems. First, the majority allows plaintiffs to recover damages for the reduction in their life expectancy but gives no guidance to litigants, juries, and our state's district courts on how such a novel claim should be valued. Under the majority's decision, juries award damages by assigning a dollar value to plaintiff's reduced life expectancy. But I see no framework that would allow a jury to assess damage fairly and logically, without inviting speculation, guess, passion, or prejudice. 4A Minn. Dist. Judges Ass'n, *Minnesota Practice–Jury Instruction Guides, Civil,* CIVJIG 90.15 (5th ed.2006) (stating that the jury "must not decide damages based on speculation or guess").[8]

---

8. The majority conspicuously ignores the other item of damage sought by the Dickhoffs—the medical expenses and pain and suffering related to the 2010 recurrence of Jocelyn's cancer—and provides no guidance to the district court on how those damages should be analyzed in this case. As noted above, the Dickhoffs cannot prove that Dr. Tollefsrud

*caused* the recurrence. Indeed, the Dickhoffs' expert testimony stated only that Dr. Tollefsrud changed the likelihood of recurrence "from unlikely to probable," which could mean that the likelihood of recurrence merely changed from 49% to 51%. As such, recovery of 100% of the costs of that recurrence is inappropriate. Arguably, the plaintiffs could

Second, the majority's adoption of loss of chance will actually *overcompensate* plaintiffs in certain circumstances. The problem stems from the fact that the majority allows a plaintiff to recover damages from her doctor for loss of chance before knowing whether that chance will ever materialize in harm. Take, for example, a young plaintiff who originally had a life expectancy of 80 years. A delayed diagnosis, however, created a situation in which there is a 20% chance the plaintiff will die by age 10, but she retains an 80% chance of beating the cancer and living to the originally expected age of 80. In other words, the plaintiff's new life expectancy considering the risk of early death is 66 years instead of 80 years, a reduction of 14 years. Under the majority's theory, that plaintiff may sue her doctor while still living and recover the full amount of damages for these 14 years of life that have been theoretically lost. If a jury determined these 14 years of potential lost life to be worth $1,000,000, she could recover that $1,000,000 from her doctor even though it is *highly probable (80%) that she will live as long as she would have without the negligence.* And if the plaintiff does survive, then she has received $1,000,000 as "compensation" even though no ultimate harm ever befalls her. Allowing a plaintiff to recover damages when it is 80% likely that that the harm will never materialize defies our requirement that the plaintiff prove "future damages to a reasonable

certainty." *Pietrzak,* 295 N.W.2d at 507. Moreover, such an award is not "compensation" in any meaningful sense of the word, but a windfall at the expense of physicians and the healthcare system and an invitation to abuse.

As to deterrence, I agree that the prevention of medical negligence is a laudable goal. But it is not the only goal. Fairness and the tailoring of liability to those that have actually directly caused harm is also important. As the supreme courts of other states have aptly observed, " '[i]f deterrence were the sole value to be served by tort law, we could dispense with the notion of causation altogether and award damages on the basis of negligence alone.' " *Weymers v. Khera,* 454 Mich. 639, 563 N.W.2d 647, 654 (1997) (quoting *Kramer,* 858 S.W.2d at 406).

But even if deterrence were the principal objective, I disagree with the majority's contention that traditional tort liability fails to deter medical negligence. The majority seems to assume that, at the time negligent conduct is committed, physicians *know* whether their conduct will result in harm to the patient, and thus some physicians will not be deterred because there is no potential for liability. This is, of course, incorrect. Traditional tort principles deter all medical negligence because the physician is aware that *any* negligence could result in harm to the patient and open up the possibility for liability as a result.[9] Further, there is little deterrent

---

pursue "proportional recovery" by multiplying the total cost of recurrence by the percentage chance of recurrence caused by the doctor's negligence. But plaintiffs' expert, Dr. Forman, could not explain what that percentage was and admitted that "[*i* ]*t is impossible to put precise statistics* " on the likelihood of recurrence with or without timely care. This underscores the speculative nature of the Dickhoffs' recovery here and demonstrates why we should reverse at least with respect to this item of damage.

9. For a discussion of the relative deterrent value of traditional tort rules and the loss of chance doctrine, see generally David A. Fischer, *Tort Recovery for Loss of a Chance,* 36 Wake Forest L.Rev. 605, 631–32 (2001) (noting that most physicians are adequately deterred by the "all or nothing rule" because they "diagnose and treat a variety of patients with a variety of ailments, giving rise to widely varying chances of a cure").

value in extracting a penalty from a physician if it cannot be shown that she in fact directly caused any harm. *See Mohr v. Grantham,* 172 Wash.2d 844, 262 P.3d 490, 499 (2011) (Madsen, C.J., dissenting) (stating that "[d]eterrence of negligence that does not cause actual harm is a meaningless proposition"). The prospect of liability for harms that the physician did not cause is not likely to deter negligence, but rather is more likely to "encourage the practice of costly defensive medicine in an attempt to avoid practically certain liability in the event of an unfavorable outcome." *Falcon v. Mem'l Hosp.,* 436 Mich. 443, 462 N.W.2d 44, 66 (1990) (Riley, C.J., dissenting). As such, the aim of deterrence does not justify the result today.

## II.

In sum, the majority's decision greatly expands the liability of medical professionals in this state and unfairly holds physicians liable for harms that may never materialize and, if they do occur, are not caused by the physician's negligence. In so doing, the majority sua sponte overrules two well-established cases and undermines unbroken and fundamental principles of tort law. Such a drastic expansion of liability, especially in the healthcare field, implicates serious policy considerations, which are better addressed by the Legislature. Therefore, I would reverse the court of appeals and reinstate the order of the district court.

GILDEA, Chief Justice (dissenting).

I join in the dissent of Justice Dietzen.